My last cases of the morning are United States v. Paniry, and then United States v. Matsuri. But we'll start with U.S. v. Paniry. Your Honors, Todd Burns on behalf of Mr. Paniry. My hope is to reserve three minutes for rebuttal, and my plan is to address at least some of the sufficiency arguments. I want to begin by discussing the conspiracies to commit money laundering and drug trafficking, because the core arguments with respect to both of those counts of conviction are essentially the same. This case arose out of DEA agent Rojas' hopes to infiltrate a global drug trafficking and or money laundering conspiracy. Apparently, he was unsuccessful with that in South America and in Amsterdam, and he focused attention back home and constructed something of a global drug and money laundering conspiracy in his conversations with the number one defendant in this case, Moshi Matsuri. Those fictions formed a great deal of what was charged in the indictment, and what the indictment charged in both contexts were global conspiracies involving countless countries and four continents, unknown numbers of financial institutions, hundreds of thousands of dollars of transactions, tens of kilos of cocaine. Most of this was constructed from whole cloth, but all of it charged in the indictment. And the simple reason that there's insufficient evidence to convict Mr. Panieri on both of those counts is that there was no evidence whatsoever that he had any inkling that there was such an agreement, that there was such a conspiracy, these broad global conspiracies. And that alone is reason to reverse those convictions and order a judgment of acquittal. The government doesn't respond to that argument, and that's the primary argument raised with respect to both of those counts. Instead, it responds to a fallback argument, which could be characterized as a rhetorical flourish in the briefs, which is, look, even if the indictments had been more modestly drawn to just focus on what Mr. Panieri actually was involved in, there still would be insufficient evidence to convict on the conspiracy because there is no evidence that he believed he was involved in a drug trafficking conspiracy or a money laundering conspiracy. And I think what makes that point better than anything is to look at the four cash drops that Mr. Panieri was involved in that are the bulk of the government's evidence against him. Two of those cash drops, which occurred in December 2012 and February 2013, the government says, well, those two, those demonstrated his involvement in money laundering. Another two, which occurred in May of 2013, the government says, well, those two are his involvement in a drug conspiracy. And there's zero evidence to distinguish between those cash drops. We could just as well say, well, one of them was demonstrated his involvement in terrorism. Another one demonstrated his involvement in trafficking and endangered species. They could just pretty much make it up. They throw two into one bucket and two into the other bucket with no evidence to distinguish what he believed those cash drops involved. And so what they fall back on is essentially the argument that Mr. Panieri and Mr. Mossery were so close, the nature of their relationship was such that the court and the jury can simply impute everything Mr. Mossery knew to Mr. Panieri. Now, I would suggest it's doubtful that you could ever have that sort of transfer of criminal intent and non-individualized guilt in any circumstance. Maybe there is a circumstance where it could be shown that two defendants were so close and so regularly traded core information that that inference would fly in a specific context. But in this context, the evidence, in this case, the evidence surely does not support it. What the evidence shows is that on four occasions, Mr. Panieri made cash drops. And on those four occasions, he was directed and watched closely by Mr. Mossery from nearby. And then on another occasion, Mr. Panieri was involved in a car being driven from California to Utah. Again, with Mr. Mossery closely following what was going on and giving direction. These circumstances don't suggest a surfeit of trust on Mr. Mossery's part. What they suggest is that he's keeping close control. And if there's not a surfeit of trust, then why would one infer that Mr. Mossery is telling Mr. Panieri everything he knows and believes about his criminal dealings? And furthermore, they don't suggest a relationship such that Mr. Panieri is essentially, you know, making decisions on behalf of this alleged organization doing things on his own. He's being kept closely under control. And what's interesting, too, is that when asked during trial, DA Agent Rojas was asked, well, what was the nature of the relationship between these two as far as the criminality that was going on? He said, I don't know. So how the jury is supposed to make these inferences about the relationship that would allow them to put all of Mr. Mossery's criminal intent, criminal knowledge, criminal beliefs to Mr. Panieri when the DEA case agent at the center of the case can't do so, is a mystery that's unexplained by the government. But the reality is in these meetings amongst Mr. Mossery, the DEA agent, the Montebello Police Department officer that was central undercover in this case, and to lesser degree, Mr. Garinger, defendant number two, Mr. Panieri's name is mentioned not once. Not once. So the claim that Mr. Panieri is somehow so involved in this alleged organization, it's just not supported by the evidence. And if you don't have that imputation of Mr. Mossery's knowledge, not only do the conspiracy counts fall, but pretty much all the substantive counts fall as well. Now, there are other reasons that the substantive counts fail. For example, the two money laundering substantive counts require that there have been a representation to Mr. Panieri by a law enforcement officer that the funds involved were the proceeds of drug trafficking activity. There was never such a representation. And the other substantive count with respect to the attempt to distribute drugs involving the driving of the car to Utah, there is no indication that Mr. Panieri believed that car contained drugs. And as a matter of fact, to try and fill that gap, the government says, oh, well, Mr. Espiro, who drove the car, was told that it contained drugs, and Mr. Panieri was there. No, Mr. Panieri was not there. Agent Kamwee, or Officer Kamwee, who handed off the car, specifically said he never interacted with Mr. Panieri. And it's evident from the trial evidence that Mr. Panieri was not at the location when the car was dropped off. So the one piece of evidence that the government really tries to hang its hat on with respect to the attempt charge, they just misrepresent what the trial evidence was. Turning to the extortion counts. In my briefs, I focus, and the government focused, on whether or not the events of this case showed an effect on interstate commerce. And in reviewing the charges yesterday and preparing for the argument, I realized that that was an erroneous focus. Because the charges, actually, in the indictment, allege a conspiracy to affect commerce, an attempt to affect commerce. The court looks at the actual jury instructions at 359 to 360. The only sensible way to read those instructions is that the government's theory at trial was that there was a conspiracy or an agreement to try and get this Vegas Chab guy to pay a debt. Yeah, no, I think that's the government's weakest argument on the Hobbs Act, interstate commerce. Because Vegas Chab was actually here in California, right? Yes. At the extortion count, when he was allegedly extorting him. He was actually just here on his cell phone. I mean, was his cell phone sufficient for interstate commerce now? Well, I don't think so, because there's no indication even that there was any sort of, that the cell phone signal crossed the state lines. But there's really no indication that Mr. Panieri knows anything about any of that. The only indication is that he knows that he's making a threat to collect a debt. No indication he knows what the debt is owed for, how much the debt is, etc. But what's really interesting is if you look at the jury instructions, what the government's theory is is that they tried to collect this debt, and if the debt were collected, commerce from one state to another would have been affected. That is, their theory was not that there was an effect on interstate commerce, and that's at page 360 of the excerpts. Their theory was that if this threat had been successful and the debt were paid, that payment of the debt would have affected interstate commerce. But it wouldn't have, because it would have still been money from California? I mean, just because it involves money? Sure. I think that for all the arguments I've made in my briefs, that even if they were proceeding on an actual completed effect on commerce, that they would fail. But what they really argued with their jury instructions is that if the debt were paid, that would affect commerce. And given that Mr. Panieri knew nothing about, there's no evidence he knew anything about, what the debt was for, how much it was, that would mean that pretty much any time anyone makes a threat to get someone to pay a debt, or robs someone to get them to pay a debt, the hot desk would be implicated, which certainly can't be the case. It would pretty much mean that almost any attempt to get money from someone that was in any arguable way wrongful, violated the Hobbes Act, which would make the interstate commerce, the commerce element, meaningless. I'm basically at the end of my arguments, unless I wasn't going to argue any of the sentences. Well, I think that there was not direct evidence of Mr. Panieri's knowledge as to all these things. There was a lot of circumstantial evidence that he had to have known that there was drugs involved, based on the large quantities of money, the way they did the money exchange. Well, sure, accepting the point there, but what's interesting is the first two money drops, in December 2012 and February 2013, those are for the greatest sums of money. Those are for $70,000 and $85,000, and those the government says were for money laundering, not for drugs, whereas it says these two smaller drops in May of 2013 for $30,000 and $35,000, oh, those were for drugs, but there's no distinction between them and the other. As for drugs, if it was related to drugs, doesn't Taylor say that anything involved in drugs is interstate commerce? This is coming back to the extortion, the Hobbes Act issue. Taylor says if the person believes, if the defendant believes that they are robbing someone of drugs or drug proceeds because of rage, that necessarily establishes the commerce element. You know, a lot of stuff can be sort of intellectually difficult to sort out as to, well, what does that mean in an attempt, in a conspiracy context, but none of that's relevant here because there's no indication that Mr. Panieri believed that he was robbing or extorting drugs or drug proceeds. The only thing the evidence shows is that Mr. Panieri believed he was. But if it were, if it were an extortion related to drugs, you would not have an interstate commerce problem. I think that's correct. If the extortion was, look, we want your drugs or we're going to come and mess up your face or we want your drug proceeds or you have to pay us a tax on your drug proceeds, that under Taylor I believe would satisfy the commerce clause element. But those aren't the facts here. There's no indication that Mr. Panieri knows anything other than that he is making an effort to collect a debt and there's no indication he even knows how much the debt is for. If the Court doesn't have any questions on the sentencing issues or anything else, I'll reserve the rest of my time for rebuttal. All right. Thank you. May it please the Court and good morning. Tom Hrvacek on behalf of the United States. I'd like to start by talking a little bit about defendant's activities on July 9th, 2013. On that day, the testimony at trial established that the defendant, J. Panieri, was at a Wal-Mart parking lot in Los Angeles. Observing at the time a handoff of a vehicle that his boss, co-defendant Moshe Mastry, believed contained five kilograms of cocaine. He also, the testimony at trial, established that there was a communication that was given to co-defendant Espiro regarding what to say to the person picking up that vehicle. And the evidence established that co-defendant Mastry told the defendant to tell Espiro the identity of the driver because that was important to the person delivering the car. Later that day, the defendant followed that vehicle, and there's evidence in the record contrary to what the defense counsel said earlier, that there was a black BMW at that Wal-Mart parking lot, the same black BMW that was seen in earlier transactions driven by the defendant, was seen following the green Toyota all the way to St. George, Utah, where the defendant, J. Panieri, delivered the keys of that vehicle to another undercover DEA agent after a 45-minute standoff in which he exchanged not one, not two, but three phone calls with Moshe Mastry regarding the holdup and the delivery. And they discussed that the holdup and the delivery was the identity of the person delivering the vehicle. After that, and the successful drop, the defendant and Moshe Mastry continued their conversations that day. They talked about additional deliveries to Utah and about how they had a special way to get their car there. In fact, Mastry stated in one of the calls, next week, and he was talking to Panieri during one of the recorded phone calls, next week, I'm going to be with some other guys, so don't make me a problem. I'm going to charge for everything here, speaking with reference to the vehicle and the delivery of the vehicle, so don't make me a problem. I know what, tell them I know exactly what I'm doing. And then at the end of that day, on July 9, 2013, the defendant, in close coordination with co-defendant Mastry, helped organize and execute an extortion attempt on an individual that had been represented to them to be Vegas Chad, or at least specifically to Mr. Mastry as Vegas Chad. It also represented to Mr. Mastry that Vegas Chad was a drug trafficker from Vegas who owed a debt to the Rojas organization. And the day finished with Mr. Panieri, the defendant, talking to Mr. Mastry on the phone as what appears to be as the violence is occurring to the vehicle back in the Los Angeles area. That is one day in the life of this defendant during this particular conspiracy and his involvement in the Mastry organization, which as the trial evidence demonstrated, he was involved in all facets. The money laundering facet, the drug trafficking facet, as well as the extortion facet. I'd like to now discuss a little bit more of the drug trafficking conspiracy and the attempt to possess with intent to distribute cocaine and the evidence at trial that was on that issue. And just to be clear, that's Counts 3 and 22. As the defense counsel has just noted, there is no dispute that there was a drug trafficking conspiracy at issue here. What is at issue is the defendant's knowledge of that conspiracy. And as Judge Wardlaw noted, there is evidence to support that. There is circumstantial evidence of the defendant's knowledge of the drug trafficking conspiracy. The first issue is, or the first fact that suggests knowledge, is his participation in multiple drug transactions. He's not involved in just one cash drop in May 2013 for the 10-kilogram deal, not involved in just two. He's also involved in the five-kilogram transfer in July from Los Angeles to Utah. Furthermore, after that transfer in July of 2013 of the five-kilogram car in Utah, he and co-defendant Mastry are talking about additional deals that the two would undertake. With regard to Pinieri's role within the organization, it's also a key fact here. There are more than 20 phone calls over a two-month period between Mr. Mastry and Pinieri that the government admitted during the trial that they found probative of his involvement in this organization. There were three phone calls on the day of the first cash drop on May 8, 2013, and there were at least six phone calls on July 9, 2013, whose events I just recounted. And there is evidence at trial that he acted as a conduit both in the May 8, 2013 drop, where he communicated instructions from Mr. Mastry to the individual who approached and delivered the cash, and there's also indication that he communicated the importance of the driver of the vehicle to Mr. Espiro before he talked to Detective Camus, who testified that Mr. Espiro said that his girlfriend, who was a white woman, would drive the vehicle. Pinieri also held an entrusted position within this organization. He supervised the cash delivery on May 18, 2013. He supervised the act of vandalism and furtherance of the extortion, and he handled and delivered more than $150,000 in U.S. currency as part of the money laundering conspiracy. As Agent Platt testified, those drops that he engaged in in December of 2012 and in February of 2013 were Hawala-based drops. They're drops based on trust. Mastry had enough trust in Pinieri that he trusted him not only with the amount of money that he was delivering, as both times indicates that Mr. Pinieri knows the substance and knows the amount of money in the bag, but he also did so knowing that Mr. Pinieri was delivering money that belonged to a Colombian drug cartel Furthermore, regarding the drug trafficking conspiracy and knowledge that Mr. Pinieri had, there was the interaction between Mr. Pinieri and Mr. Espiro on July 9th. As we discussed earlier, there was an indication that Mr. Espiro communicated the information that Mr. Mastry said regarding the identity of the driver to Mr. Espiro, who then told Mr. Pinieri that Mr. Espiro was the driver. There is no evidence in the record that Mr. Espiro and Mr. Mastry had any conversation about this particular issue. There is also the evidence of the standoff, which took 45 minutes for Mr. Pinieri to deliver a vehicle where the only issue was the identity of the driver of the vehicle. And there's coded language used throughout their conversations between Mr. Pinieri and Mr. Mastry throughout the calls. As to the issue of the extortion... On the effect on interstate commerce. Yes, Your Honor. The government's position first is that there is evidence that Mr. Biggishad was a drug trafficker. What's the evidence that Pinieri knew that? The evidence, Your Honor, is imputed by the closeness of the relationship between the two, the frankness of their conversations that can be seen through the record. Let's give me something specific that shows that he knew it was a drug transaction. Your Honor, I don't have any direct evidence that he knew it was a drug transaction. I know, but give me some circumstantial evidence that he knew. Well, there's evidence that Mr. Mastry knew that it was a $40,000 debt. There's evidence that he knew he had to send two people to help collect it. In terms of whether Mr. Pinieri needed to know it was a drug that was being collected, this argument... What's the language from Taylor? Did they believe it involved drugs? That's what the court used in Taylor. This court, however, in United States v. Nelson, which is at record site 137 F3D 1094, which admittedly the government has not briefed on, did hold that the... specifically held that in an aiding and abetting instruction was proper in a Hobbs Act case where the defendants did not need to know that their actions would actually affect interstate commerce. And in this case, and this court has held in Rodriguez, that in a reverse sting context, the fact that drug trafficking is at issue is sufficient to meet interstate commerce. And the government would further argue that there is an imputation of knowledge here, again, given the extensive relationship between Mr. Mastry and Mr. Pinieri and the collection efforts in this case. As to the money laundering conspiracies, the government's evidence in support of those particular conspiracies is not just that there were two cash drops in December of 2012 and one in February 2013. As the government noted, they were Huala-based transactions, ones based on trust. And Mr. Mastry trusted Mr. Pinieri enough to let him walk out with more than $150,000 in U.S. currency and deliver that, knowing the amounts and knowing that Mr. Mastry was dealing with a Colombian drug cartel, or believing he was dealing with a Colombian drug cartel. If you had to pick one or the other, which would you say is the stronger evidence of knowledge of the drugs or knowledge of money laundering? Your Honor, that would be the knowledge of the drugs. And is that based on telephone conversations? Yes, Your Honor. And as the government noted in the record, the government did not have the wire up at the time of the money laundering transactions involving Mr. Pinieri and Mr. Mastry. So it's principally the recorded calls and the inferences that can be drawn from those recorded calls? Yes. The inferences are just the volume of calls, the coded language, the repeated times that Mr. Pinieri shows up at transactions involving narcotics. All that is evidence the government submits strong circumstantial evidence of knowledge that he's involved in a drug trafficking conspiracy. In terms of the money laundering, there is the additional fact that the defendant doesn't seem at all uncomfortable at any point in dealing with any of these particular transactions. He doesn't seem to not understand when Mr. Mastry speaks to him in coded language. There seems to be an understanding as to what's going on here, and a comfort that implies that during the money laundering transactions, Mr. Pinieri knew enough about the transactions at issue such that a reasonable jury could find him guilty of those offenses. And I'd like to turn briefly to the issue of the defendant raised, the issue of plain error and a jury instruction on the drug quantity finding in his briefing, and the claim that the government waived its argument as to prongs to the plain error argument. The first point I would make is that the defendant's argument is that the court had to give an instruction that Mr. Pinieri believed there were five kilograms involved in this transaction because it's a fake transaction. The cases, however, cited by defendants do not stand for that proposition. Cortez is a sentencing entrapment case in which this court held that that is a jury question. The other two cases are conspiracy cases. Furthermore, just so the court's aware, the court below did give a sentencing entrapment instruction to the jury, and that is at E.R. Or 23, I believe. Sorry, it's actually at E.R. 339 through 341. And the record also indicates that prior to giving that instruction, the court and the parties discussed Cortez at length, like the case that the defendant cited. And if there are no further questions, the government would rest. Thank you. I'd like to begin with the coded language thing because that was mentioned a few times, and it's sort of emblematic of a lot of what's going on in this case. There was no coded language that needed to be decoded. If there were, a government agent would have come up and said that coded language refers to drug trafficking. There was no such testimony. The coded language is stuff that's obvious. It's directions to go, you know, commit the threat. Did Rojas testify to what a lot of the coded language meant? Sure, but it's obvious things such as directions to go make the threat. There's no coded language that's deciphered about that Mr. Panieri is discussing drugs with Mr. Matsuri. Now, in Mr. Matsuri's case, there may be some other coded discussion things between them, but nothing, no conversations involving Mr. Matsuri in which there is any sort of coded language deciphered that they say, oh, this relates to drugs. There's just nothing like that. And I think this case demonstrates well two perils. One is what can happen when the government makes up the whole criminality, such as they did in this case, and now they can refer to the Matsuri organization. There was no Matsuri organization. The agents didn't even claim there was a Matsuri organization. They create this whole big conspiracy almost out of whole cloth, and now they can call it the Matsuri organization. There's just no evidence for that. And two is when you have someone's guilt, guilty knowledge, guilty belief, imputed to someone else based on really nothing, and that's what the government is trying to do here. They're over and over again hitting on what Matsuri knew and what Matsuri believed and what was said to Matsuri, but if you look at what actually Panieri— Doesn't our case law say that close coordination can give rise to the inference of an agreement? Well, sure, but I think there has to be something more, close coordination as to what, and I think that's when the problem of manufactured criminality comes into play here because what are they coordinating? They're coordinating a fiction when you're talking about the drug and the money laundering. And the idea, too, that there is some sort of relationship of trust here so you should be able to impute all of Matsuri's knowledge to Panieri's is just not supported by the evidence. It's interesting. Government counsel talks about, oh, well, he sent him out with these two cash drops and the money laundering and trusted him to make those cash drops. No, he didn't. He followed him, and he observed him from a distance when he made those cash drops. That doesn't indicate trust. That indicates managing someone who you're using to insulate yourself from criminal liability. And if you're using that person to insulate yourself from criminal liability, do you go and tell them everything you know about all your criminal conduct that you're cooking up with this other person? It doesn't make sense whatsoever. But I think, again, it comes back to there's no distinction in the four cash drops as to what Mr. Panieri thought he was doing. How does the government just get to say, oh, well, we want to claim two are drug trafficking and two are money laundering? There's no evidence to make that distinction. They're making it out of whole cloth. There's no coded language that supports that. There's nothing that supports it. Thank you. Thank you. The case is submitted. We'll now hear the case of Mr. Massery. Thanks. You're welcome, Judge. This is painful. I'm just saying that's what it started to look like. May it please the Court. Good morning, Your Honors. Samuel Joseph for Appellant Motion Massery. My co-counsel, James Bird, is at counsel table. Thank you. Your Honors, I wanted to start with the interstate commerce issue on the extortion count because government counsel was just talking about that on the related case. There is no evidence in the record that even Mr. Massery was told that this involved a drug debt collection. I can point to court the extent of the evidence on the interstate commerce and on the extortion counts was from ER 706 to 715, 723, 731, and 766, and that's what's cited in the government's answering brief. Judge Reinhart's question about Taylor and whether it would have been enough for the defendants to know that this involved a drug debt collection is irrelevant for this case because, first of all, in Taylor the defendants intentionally robbed drug dealers and went after drug proceeds. What Detective Camus testified to at trial with respect to why this debt was being collected was that he told Mr. Massery, I provided him with a fictitious name and a vehicle description and an address of this person who owed me money. That was on ER 707. So there's no evidence whatsoever that drugs were involved at all, that Chad was a drug trafficker, a drug customer, and all of the other reasons why the government gives that interstate commerce was affected here, a car being traveling in interstate commerce, manufactured in interstate commerce. Those are all inferences that the government's asking. My question is if there's evidence of drug transaction, then there's no interstate commerce problem. Agreed, and I would agree with that, Your Honor. There just is no evidence here. Mr. Massery is asking primarily for a new trial as a result of the district court's failure to instruct on the dual role testimony of both Agent Rojas and Detective Camus. Now, the government has conceded that there are seven categories of improper testimony, improper expert testimony in this trial, and I think Toralba, Mendia, and this court's decision in Vera call that plain error. The district court should have instructed on the agent's dual role. This is kind of an interesting case because it's not the classic dual role where you have the agent interpreting a conversation between two other people who are having a recorded conversation. This is the agent interpreting a conversation in which he participated. That's correct, and we cited United States v. Prang in our reply brief, which was the First Circuit case that's saying the analysis is the same. If the agent is involved in the conversation, the question is still, what is the agent basing his opinions on when he's giving those opinions to the jury? And if the agent is basing his opinions on his knowledge of the investigation in this case, then it would properly be considered lay testimony, but he still has to give his reasons for the opinion. So 701 would still require that his opinion is rationally based on his perception. Was there an objection made at trial? There wasn't. A lot of this testimony was unobjected to, and that's why we're under plain error review. But this court's decisions make it clear that it's the district court's role to serve that gatekeeping function. I think what Your Honor is also pointing out is that this case is unusual because there are no foundations given for whether this was lay testimony or whether this was expert testimony. And the government has conceded that there's certainly expert testimony, and there's certainly times in the record where the agents are testifying based on the drug trafficking business. For example, one of the terms that was interpreted was a hand, that a hand meant five kilos of cocaine. And Agent Camus said, when you're talking drug business, a hand means five kilos of cocaine. There's plenty of other times in the record where we just don't know whether what Mr. Mottry or Mr. Gerringer or other defendants are saying and the interpretation that's being given by either Rojas or Camus is based on those agents' experience investigating prior cases or whether it's based on this investigation itself. And Vera and then the Fourth Circuit case that we said at Garcia made clear that it's that lack of foundation, it's that lack of basis that makes it so problematic for the jury, that the jury doesn't know whether they are listening to testimony that they can interpret, they can evaluate based on things that are before them that they know that evidence has come in, or whether they're just deferring to expert opinion. And without instructing the jury on how to evaluate those two different types of testimony, that's where the prejudice is. And I want to talk about prejudice given, of course, the government's concession that there are all of these categories that were improperly admitted. The defense in this case was entrapment. The defense in this case was that the government bore the burden to prove that Mr. Mottry was not predisposed to commit these offenses and that the burden was that they had to show that the government did not induce Mr. Mottry to take part in these offenses. Now, just given the seven categories that we can agree on that were improperly admitted, those went to the heart of that defense. And as an example, at ER 379, one of the categories that the government concedes was erroneously admitted was that Mr. Mottry and his co-defendants avoided red flags in the financial system by not transferring large amounts of cash, that they would disperse it and have smaller amounts of cash. And as Rohat justified, within the whole circle of drug trafficking, it's huge on whether this enables a drug trafficker to continue his or her business. So that testimony alone is telling the jury that these defendants are acting in a way in line with experienced drug traffickers. There's another instance at ER 390 where Agent Rohat says that the money laundering system that, of course, that the agents have concocted but that have gotten Mr. Mottry and his co-defendants to take part in, is the standard system that was familiar to the DEA Financial Investigations Group. So again, he's telling the jury that these defendants are acting in a way consistent with experienced drug traffickers. And, Your Honors, even the fact that they are, that the agents are up there on the stand and telling the jury that they're speaking in code, that they're speaking in a way to mask their conversations, it shows that these defendants were predisposed because they're speaking like drug traffickers. And the agents made that very clear. The Agent Camus or Detective Camus at ER 616 said that the defendants, like drug traffickers, took precautions to avoid law enforcement. So again, they are acting in a way they're predisposed. It's not the government that made them do this. They're acting in line with how these agents have seen other drug traffickers and other money launderers have acted. I can go through all of the examples, but they're in the government's brief, and there's seven such examples. Now, I would say that what the government has done in its answering brief is really minimize the role that these agents played during the trial. The government basically says these things were scattered around the trial, that nothing was relied on in closing, and that there was overwhelming evidence, as to Mr. Mottri, without this improper testimony. And that's just not true. That's a misrepresentation of the record. The agents' names were named in the closing 51 times. They were repeatedly emphasized, and in fact, during the rebuttal, the government said that undercover officers infiltrated an organization, and undercover officers posing as drug dealers were part of each and every one of the deals that we've discussed here today. And that's at ER 1058. The government's entire case was these agents. There was about four to four and a half days of testimony total, and these agents, Agent Rojas and Detective Camus, testified for three days. That's more than 75% of the trial testimony, and that's what this court and other courts have looked at when looking at the prejudice, when analyzing the prejudice of improper testimony. The Garcia case in the Fourth Circuit basically was all about one agent's testimony. It was an expert witness that came up six days over the course of 12 days, so about half the trial. What this court said in Vera was that the drug quantity amounts that were testified to improperly by an expert and lay government witness took up the primary evidence in that case during the trial, and there is no evidence in this case, like Mr. Burns said with respect to Mr. Panieri, that wasn't involving the government. The government had its hand, had its interpretation of every single one of the transactions in this case. I want to speak just briefly also about the sentencing errors. Can you just discuss the jurisdiction prerequisite and the extortion issue? Absolutely, Your Honor. Again, the government said that there was essentially four different ways that they established the interstate commerce element was satisfied. The first was that the car that Mr. Panieri was in when he spoke with Mr. Mottri, which doesn't reference anything about the extortion, but that it was traveling in interstate commerce, and there was just no evidence in the record that the car was traveling in interstate commerce. I think there was a reference by Mr. Panieri that he had stopped to get married, but certainly all of the cases at the government site that involve the use of a vehicle to satisfy that element have actual evidence that was introduced at trial that the car was manufactured out of state or that it traveled out of state or between states. I think the government oftentimes relies on the fact that they call him Vegas Chad and that somehow that shows that he lived out of state. All of the testimony about who Chad was and where Chad was during this time period was that he lived in Marina Del Rey and that his girlfriend lived in these apartments in Toluca Lake where the vehicle was and that the extortion was going to, the vandalism, the act of vandalism was going to take place at those Toluca Lake apartments. There's no evidence that the government also talked about a phone call to a Las Vegas number. Unlike the cases at the sites, there's no evidence that any interstate telephone system was used, no evidence of cell towers or anything. I think, Your Honor, pointing out that in the age of mobile phones and you're standing right next to each other, the government certainly needs to point out some kind of effect on an interstate telephone system or interstate commerce to satisfy. Are mobile or cell phone transmissions considered interstate? There's no evidence of it on the record. I mean, I think just speaking generally, the government would normally introduce some kind of evidence that a tower in one state was hit and it bounced off that tower and hit another tower in another state. The government didn't even try to introduce evidence like that during trial. And I think what the government is doing is trying to say, look, we've got a case here involving, you know, meeting that started off with Agent Rojas talking about an individual in Miami and another individual in Amsterdam and they kind of took for granted that interstate commerce would be satisfied as to extortion. I think this court's decision in James, which involved the bank robbery statute and whether the government had satisfied the FDIC element of the banks, where they just argued to the jury these were large banks, these were big financial institutions. It's similar here where they didn't actually submit any evidence. They simply are making arguments about why. How did Vegas Chad come to owe Mazri $80,000? Vegas Chad, the story was that Vegas Chad owed a debt to Detective Camus. And what Detective Camus testified to was that Vegas Chad was supposed to be a cocaine customer of his. And that's just testimony about who he was supposed to be. But no evidence that he ever told that to Mr. Mazri, no evidence that Mr. Mazri ever knew that this debt collection involved drugs. And so the record is just completely bare on that point. I see I have a minute and a half left. Go ahead and address the sentencing issues. Thank you, Your Honor. On the sentencing, again, as to the grouping argument, which is that the district court failed to group the money laundering and the drug trafficking counts, under Lopez I think that that's a straightforward issue. This court's decision in Lopez holds that under 3D1.2B, especially with the facts here that all of these transactions involved the same individuals. This was an entirely government-run sting. All of the money laundering and drug trafficking transactions involved Agent Rojas and Detective Camus. And Lopez holds that the victim, therefore, the societal interests that are harmed by those related transactions is the same. It also involved the same common criminal objective. I mean, what the government used the expert Detective Platt or Agent Platt on the money laundering counts and argued in closing was that the reason why drug traffickers launder money is so that they can essentially reap the benefits of their illicit trafficking and have money to then go and buy more drugs. And that's the common criminal objective that the government argued to the jury. And then when it came to sentencing, they tried to parse these two things out so finely that they wouldn't group and that a six-year enhancement would apply for non-grouping. And that's just not what the evidence in this case was. Briefly, I know that in the government's answering brief, they said that Mr. Matsui had made an argument in an under seal submission that basically his efforts in cooperation for five years should be factored into the district court in its sentencing analysis under at least 3553. And the government came back and said, oh, no, the district court considered that, but he found it to be an aggravating factor. The government's site on that point, which was 1356 of the record, it's actually the prosecutor speaking. The district court never addressed that whatsoever, never addressed the under sealed filing at all or the argument that trial counsel made about Mr. Matsui's cooperation throughout that period of time. Thank you. Thank you, Aaron. Good morning. May I please start? Catherine Reichen on behalf of the United States. To deal with a minor point, do you agree with the counsel? I do. That's correct. About the under seal issue? Yeah. Yes, that was my mistake. I misquoted it. I would like to start. May I interrupt? I'd like to take a five-minute break. All right. Fine. We will. Thank you. What did he say? Yes. Yes. He said yes. All right. Thanks. Thank you. Court is adjourned. Court is adjourned. Court is adjourned. Court is adjourned. Court is adjourned. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you all.  Thank you. Your Honor. We were on, we were on whether or not the district court considered the material under seal in calculating the sentence. And that one was in error, right? Yes. Thank you, Your Honor. That argument, the under seal argument, I misquoted a section that was actually the prosecutor. But I believe that the district court did consider the argument at various places in the record. It said at E.R. 1347 that it had reviewed all the sentencing positions. At E.R. 1353, the defendant then went on to argue about the under seal position, obviously before the court. And then the prosecutor also did the same thing. I wanted to address first this interstate commerce issue that we have been coming back to and whether or not they are back supporting it. So in the record at E.R. 703 and 04, Mr. Mastry offered to take care of drug debts. And then shortly thereafter. Did he use the word explicitly, drug debts? That's what's in the record that Kamui testified to. Kamui testified to that. And then at E.R. 707, Kamui also is describing a conversation that he had with Mr. Mastry and says that VegasChat is a cocaine customer of mine who owed a total of $80,000. So aside from the sort of drug evidence, there's also evidence in the record that the co-defendant, Mr. Penner, was actually traveling in interstate commerce while he was arranging this extortion with Mr. Mastry. So, you know, aside from whether or not the drug trafficking occurred, there actually was an interstate commerce component to this transaction. So I wanted to talk about the dual role instruction. The plain error standard applies here. The error is not in the question that the government concedes were improper. The error is whether or not the district court failed to respond to give a dual role instruction. I don't think that there is a clear or obvious error here. It was not so clear or obvious to the parties, which is suggested by the fact that they didn't object not even once in three days or at the time of jury instruction to say that this should have happened. And the testimony here did not come close to what's normally considered expert testimony. These were undercover agents, not case agents. As this court has previously said in Gadsden, lay opinion that relies on experience is proper. And that's what happened here. They were simply describing telephone calls in which they had each taken part. They often were describing their own words and what they meant, not even what other people had said. The foundation issue that was just raised at the outset- Well, those words wouldn't have meant something to someone who wasn't an expert. I'm sorry? Those words would not have meant something to somebody who wasn't an expert. Well, as the expert did testify, one of the other experts, Peter Platt and Stephen Paris, were the actual experts. They said that the two participants in the call have to know what the code means. And so because they were participants, they of course knew what that code meant. That's not to say that an expert witness couldn't have also come and testified about what the code words meant. He could have. He or she could have. But they weren't required to. So what I think happened here is that in the course of just describing all of the conduct that was at issue, they were listening to phone calls and they would stop and say, what did you understand this word to mean? And then they would say, I understood it to mean X. And then they would move on. There wasn't follow-up. There weren't questions saying, okay, well, does that mean that he's an experienced drug trafficker? What does that tell you? So there wasn't sort of expert opinion about what these code words meant, as if they were consistent with the behavior of a drug trafficker. I think that this case, though, with respect to dual-role testimony, is fundamentally different from what the Court has done in Vera, Freeman, and Chiralba-Mendia, in part because these were undercover agents, not case agents, but also because the testimony was incidental to and explanatory of the charged conduct. The jury was free to believe differently. They didn't have to believe that the case agents were correct. They could have said, no, that's not what they were talking about. And Mr. Masters' conduct in every instance simply corroborated what the undercover agents testified to. The evidence of the trial against him was overwhelming. It wasn't because an agent testified to a code word. And it wasn't because an agent testified about what red flags in a financial institution are. None of those things came out in closing, and none of those things were necessary for a jury to reasonably believe that Mr. Masters was guilty of the conduct. I wanted to address a handful of the questions. So there were two in particular that were just raised about avoiding red flags in the financial system and that money laundering tactics employed by defendant were pretty much the standard system. Both of those were cumulative of expert testimony that was already offered by the jury. And so, you know, any potential error or jury confusion was mitigated by the fact that they were hearing it from a witness that they knew was an expert. This court has previously said that a dual role instruction isn't the only way in which a jury can become aware of the different kinds of testimony before them. It can come out through cross-examination. It can come out because other experts testify. And that's what happened here. In addition, the concerns that were contemplated by all of the decisions about expert testimony aren't really present here. There's one about unmerited credibility. And, I mean, that's obviously a very legitimate concern. But that concern is that a notice expert, which we don't have, will also be able to make a decision  and that that lay testimony will have some sort of unmerited credibility because of the expert nature of other testimony. They just were not offered as experts in the first instance. Another concern is often whether or not expert testimony will somehow become a conduit for other improper hearsay testimony. And that's also not the case here. There's no suggestion that either witness didn't have personal knowledge about everything that they were testifying to. Unless the court has questions about that, I will move on to the sentencing. So there are two possible ways in which the drug trafficking and the money laundering offenses could have been grouped. And those are under sentencing guidelines 3D1.2B and 1.2C. And I will address C first, which I did not do in detail in my answering brief. And it says that closely related counts are when one count embodies conduct that is treated as a specific offense characteristic in or other adjustment to the guidelines applicable to another of the counts. And presumably here that means because the money was laundering drug proceeds that it should have been grouped as a drug trafficking. But the application note itself makes clear, which is note 6 to the money laundering sentencing guideline, that when laundered proceeds are actually derived from the underlying offense, grouping under subsection C is therefore appropriate. Here the laundered proceeds were not related to the drug trafficking counts in any way. There were two sets of transactions that occurred here. The first one was the money laundering counts over the course of a few months. And then a few months later, separate drug offenses. And in the money laundering counts, they were laundering money that they believed to belong, that they believed was proceeds from a drug offense from someone else. It wasn't their own drugs, it was someone else's. And then later on they go on to commit these other drug trafficking offenses. And so the money laundering that occurred in the first set of transactions really had nothing to do with the drug trafficking that happened later on. And then the second sentencing argument is similar under section 3D1.2. Did they know what the underlying thing was that they were laundering money for? Did they know that was drug proceeds? They did. Just not the drugs they were selling? Correct. Special Agent Rojas came to them and said that he was related to this Colombian cartel and he needed to launder money from his own drug trafficking. And so that's what they did in that first set of transactions. I don't have anything further, so I will submit unless you have further questions. Thank you. Just beginning with the interstate commerce and the sites to the record, on 703 to 704, the discussion is not about the Vegas Chad incident. They're having a general discussion with Mr. Mottri, and I'll quote from the witness, Detective Camus. During one of our meetings he offered me, if I was ever in need of someone to collect a debt, a drug debt for me, that he would have the people to do it. So there's nothing about Vegas Chad. There's nothing about Vegas Chad being a cocaine customer or this particular debt being a drug debt. And as to 707, the testimony was simply that Vegas Chad, as I said earlier, was supposed to be a cocaine customer of mine who owed a total of $80,000. But again, nothing, no evidence in the record at all that any of that was ever told to Mr. Mottri. Your Honors, on the dual role testimony, I think it's a... Did Camuy make that statement? On 707, that's Camuy who made that statement. On the dual role testimony, Your Honors, I think it's a fairly simple, straightforward issue. This was a case where two agents testified, Agent Rojas and Detective Camus. 75% of the evidence over the course of four days came in through them. And when you have so clearly expert and lay testimony that's being given by the same witnesses that goes to the heart of an entrapment offense, there are at least those seven categories of testimony, but endless more that have been pointed out in our briefs that talk about these individuals as experienced drug traffickers, as experienced money launderers. Without some kind of instruction that this court has mandated to tell the jury how to evaluate those two different types of testimony, the jury doesn't know how... Counsel said that the jury could just disregard or believe their own interpretations. They have law enforcement witnesses that are up there that are giving them interpretations that sometimes they say are based on their hundreds and hundreds of investigations that they've conducted previously. Other times, they don't tell them at all what their interpretations are based on, and so the jury has to assume that they're based on either those investigations or some other facts that they can't evaluate for themselves. And I think when the testimony is so clearly... When the evidence of the trial is so clearly based on these two witnesses, there needs to be a new trial where the jury is instructed properly how to evaluate those types of testimony. And if there's nothing further, I'll submit on that. Thank you, Casey. Thank you both very much. Casey and Sergey will be submitted.
judges: Pregerson, Reinhardt, Wardlaw